NILES et al. v. HOUSTON OIL CO. OF TEXAS et al. (No. 141.)

(Court of Civil Appeals of Texas. Beaumont. Nov. 29, 1916. Rehearing Denied Dec. 21, 1916.)

1. DEEDS ☞193 — AFFIDAVIT OF FORGERY — BURDEN OF PROOF.
In trespass to try title, filing by plaintiffs of affidavit of forgery of deed through which defendants derived title put upon defendants the burden of proving the execution of the deed.
[Ed. Note.—For other cases, see Deeds, Cent. Dig. §§ 562–573; Dec. Dig. ☞193.]

2. EVIDENCE ☞187—BEST AND SECONDARY— PRELIMINARIES TO ADMISSION OF SECONDARY EVIDENCE.
In trespass to try title, it was error to admit a certified copy of a deed where issue was raised as to the genuineness of the original and there was failure to account for the nonproduction of the original, and there had been a prior conveyance of the same land by the same grantor, the signature to which was not called in question, or, at least, it was an issue that should have been submitted to the jury for determination.
[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 674, 675; Dec. Dig. ☞187.]

3. DEEDS ☞25 — NATURE OF INSTRUMENT — "QUITCLAIM DEED."
A deed undertaking to "warrant or defend from all persons claiming under" the grantor was a "quitclaim deed."
[Ed. Note.—For other cases, see Deeds, Cent. Dig. § 49; Dec. Dig. ☞25.
For other definitions, see Words and Phrases, First and Second Series, Quitclaim Deed.]

4. VENDOR AND PURCHASER ☞242 — BONA FIDE PURCHASER—BURDEN OF PROOF.
It is incumbent upon a person who is seeking to set aside a prior conveyance upon the ground that he is an innocent purchaser without notice to establish the fact that would constitute him such bona fide purchaser.
[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 603–605; Dec. Dig. ☞242.]

5. VENDOR AND PURCHASER ☞224 — BONA FIDE PURCHASER—CLAIMANT UNDER GRANTEE IN QUITCLAIM DEED.
That a person's deed to land is a warranty deed does not constitute him a bona fide purchaser, where the deed to his grantor from which he derives title is a quitclaim deed.
[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 469–473; Dec. Dig. ☞224.]

6. ADVERSE POSSESSION ☞100(6)—EXTENT OF POSSESSION—RESTRICTED LEASE.
Where claimant of a league of land made a lease of the "use, occupancy, and enjoyment, rent free, of the house, fields, and improvements, now occupied" by a tenant "and situated on the league," such lease, notwithstanding the tenant agreed therein "to occupy and hold possession of said league of land" for the claimant, was a lease of a restricted parcel, the use essential to title under the statute being restricted to the parcel; it being manifestly not intended to lease the whole.
[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 563–566, 568–571, 573; Dec. Dig. ☞100(6).]

7. ADVERSE POSSESSION ☞114(2)—EXTENT OF POSSESSION—EVIDENCE.
Evidence in trespass to try title held not to show that tenant, holding under such restricted lease, extended his possession beyond the parcel he was occupying over the tract claimed.
[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 685, 686; Dec. Dig. ☞114(2).]

8. ADVERSE POSSESSION ☞100(1)—EXTENT OF CLAIM.
A man cannot enter upon the premises of another, restricting his claim to a small portion of such land of another, and, when the time of limitation has arrived, claim the entire tract by limitation.
[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. § 547; Dec. Dig. ☞100(1).]

9. APPEAL AND ERROR ☞204(1)—OBJECTION BELOW—ADMISSION OF EVIDENCE.
Error in the admission of testimony, not seasonably objected to, cannot be considered on appeal.
[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 1258; Dec. Dig. ☞204(1); Trial, Cent. Dig. § 172.]

Appeal from District Court, Hardin County; J. Llewellyn, Judge.

Action by Horace Word against the Houston Oil Company of Texas in which Edith L. Niles and others intervened. From judgment for defendants, interveners appeal. Reversed and rendered.

W. D. Gordon, Thos. J. Boten, and H. G. Russell, all of Beaumont, for appellants. Parker & Kennerly and Fred L. Williams, all of Houston, for appellees.

BROOKE, J. Appellants intervened in a case styled Horace Word v. Houston Oil Company of Texas in the trial court, seeking

to recover the George W. Brooks league of land, and made the usual allegations in a trespass to try title suit. The litigation narrowed down in the court below to a contest between the present appellants as plaintiffs and the Houston Oil Company, its coclaimants, as defendants. The trial resulted in a verdict being peremptorily instructed for the appellees.

The land was originally granted to George W. Brooks as a colonist headright. Appellants presented to the court the following chain of title:

(1) Original deed or power of attorney from George W. Brooks to Arthur Henrie, dated February 3, 1836, as follows:

"Know all men by these presents: That I, George W. Brooks in consideration of the sum of $1,300.00 to me paid by Arthur Henrie, the receipt of which I do hereby acknowledge I have this day made constituted and appointed, and by these presents do constitute and appoint Arthur Henrie my sole, true and lawful Atty., for me and in my name to bargain, sell and convey and receive pay for and execute title in my name to one sitio of land which said sitio was granted and dated on the 22d day of August, 1835, by George Antonio Nixon, commissioner, to grant, titles in the colonies of Bennet, Zavala and Vehlien, and having shape, marks and description as will more fully appear by the map or plan accompanying said title and hereby granting to said Arthur Henrie full, free and perfect administration of all my rights powers in and to said sitio of land, with irrevocable power in my Atty. to take possession of, hold, enjoy, sell alien convey and good title make in my name to any person or persons for said sitio of land, hereby ratifying and confirming all lawful acts in the premises which said Atty. or his substitute under him may do, who I here empower him to make or appoint or may do in my name hereby declaring any sale warranty deed in fee simple, to the premises lawfully made by him for all said Atty, or his substitutes may do herein to be legal and binding on me in law and equity as if done by me in my proper person and I declare that the said sum of $1,300.00 a just and fair compensation for said sitio of land, and is $50.00 more than any other person would offer me therefor, and I agree that if it is worth more the excess shall be for the benefit of said Arthur Henrie, his heirs or assigns, and I fully renounce all laws which might favor me in the attempt to annul all or any part of this instrument, and I particularly in due form to renounce the general law which forbids such renouncement and if said sitio or any part thereof was located in land claims and not vacant, I hereby authorize and empower my said Atty. or his substitute in my name to do all which are required by the laws now in force to relinquish relocate and title get to all or any part that was not vacant and to sell good title make for or of all the sitio as above mentioned.

"In witness whereof I have hereunto set my hand in presence of and with my five subscribing witnesses, in the absence of a notary on this the 3d day of Feb., 1836.

"George W. Brooks.

"William P. Hinds.
"John Fry.
"Peter Young.
"John A. Veatch.
"Jos. Carriere.

"Republic of Texas, County of Nacogdoches.

"Personally came before Richd. Parmalee, Depty clerk of the county court of said county, John A. Veatch and Jos. Carriere who being duly sworn deposed and said that they signed the within instrument as witnesses and saw George W. Brooks sign the same.

"In witness whereof I have hereunto set my hand and seal of office, at Nacogdoches, this the 3d day of March, 1838.
"Richd. Parmalee, Dep. C. Co. C."

This original power of attorney or deed was sent up as a part of the record in this case, same having been filed in Liberty county on December 13, 1847. There does not seem to be any question made of the genuineness and validity of the instrument.

(2) Deed from Arthur Henrie to Thos. Sloo, Jr., of the city of New Orleans, dated February 22, 1839, conveying this land, was introduced in evidence, this being an original instrument, properly acknowledged and recorded in Liberty county on the 13th day of December, 1847, and recorded in Hardin county on the 23d day of November, 1891.

(3) On the 12th day of April, 1839, Thos. Sloo, Jr. conveyed the same land to Jas. W. Byrne, by an act of sale executed before Wm. Christie, a duly certified and authenticated copy of which was introduced in evidence.

(4) Byrne thereafter, on the 19th day of March, 1847, for a recited consideration of $8,856, conveyed this grant of land to Stephen Butler and Thomas Benedict, the original deed being introduced in evidence. It was duly acknowledged before James Ingram, a notary public in Victoria county, and recorded in Liberty county in 1847, and in Hardin county on November 23, 1891.

Accompanying the original documents above referred to was an old Spanish map of the George W. Brooks league, introduced in evidence, and sent up with the record.

The present appellants hold under the Stephen Butler and Thomas Benedict deed, as their heirs and devisees. Two of the heirs, Edith L. Niles and Isabelle Drake, identified all of the original documents, accounting for their custody.

An undivided interest in the land was acquired from some of these heirs by W. W. Clippinger by deeds dated April 27, 1911, and February 9, 1912. It was shown that the appellants had the original Spanish grant to the George W. Brooks league, and an abstract of the land dated June 4, 1873.

Appellees introduced a certified copy of a deed purporting to have been signed by George W. Brooks, to E. O. Le Grande, of date February 24, 1841, which instrument seems to have been acknowledged on the 24th of February, 1841, before one William Myers, as notary public, and to have been recorded in Menard county on the 23d day of February, 1842. What was offered in evidence was a certified copy of that record, under the hand and seal of the county clerk of Tyler county, dated the 11th day of August, 1885, as follows:

"The Republic of Texas, County of Jasper.

"Be it known that on this 24th day of Feb. A. D. 1841, eighteen and forty-one, I, George W. Brooks of the county and Republic aforesaid for and in consideration of the sum of one thousand dollars to me in hand paid by Edwin O. LeGrande of the county of San Augustine and

Republic aforesaid, the receipt whereof is hereby acknowledged, have this day granted bargained sold and conveyed and by these presents do grant bargain sell alien convey and confirm in bona fide sale all that tract of land containing four thousand four hundred and twenty-eight acres of land commencing on the west bank of the river Neches, thence west 9,290 varas, thence north 2,500 varas, thence east 10,600 said river, thence with the meanders of said river to the place of beginning containing 20 labors of arable land the rest pasture land. It being the league of land granted by George Antonio Nixon, commissioner for Zavallas Colonoz on the 22d day of Aug. A. D. 1835 and for particular description reference is hereby made to the original plot and field notes of survey now on file and of record in the general land office in the republic and for the said Edward O. Le Grande his heirs and assigns to have and to hold said land together with all and singular the rights members and appurtenances thereunto belonging, and I the said Geo. W. Brooks for myself, my heirs executors administrators and assigns do and will warrant and forever defend the right title and claims of the above described league of land unto the said Edwin O. Le Grande his heirs executors administrators and assigns not against myself the said Brooks my heirs and assigns but against the lawful claims of all persons whatsoever. In testimony of which I have hereunto set my hand and seal day and date above written.

"Geo. W. Brooks [Seal.]
"Signed, sealed and delivered in presence of Thomas Mark, Ric'd E. Cooper.

"Republic of Texas, County of Jasper.

"Personally appeared before me at my office in the town of Jasper, Geo. W. Brooks who acknowledged his signature to the above and foregoing deed and for the uses and purposes therein contained and set forth.

"Given under my hand and seal of office in the town of Jasper this the 24th day of Feb. A. D. 1841.        Wm. Myers, Notary Public.

"Republic of Texas, County of Menard.

"I do hereby certify that the above is a true copy of the original as recorded in my office this 23d day of Feb. 1842. James B. Arnett, by C. C. Arnett, D. P. County Recorder.

"The State of Texas, County of Tyler.

"I, J. F. Heard, clerk of the county court in and for said county do hereby certify that the foregoing is a true transcript from the records of my office as appears on page 143 & 144 of Book 1, known as the Record of Lands of Menard County (now Tyler county).

"Given under my hand and seal of office, at Woodville, Texas, this 11th day of Aug. A. D. 1885. J. F. Heard, County Clerk, Tyler County, Texas."

Against this deed there was filed an affidavit of forgery, and also a pleading attacking the deed as a forgery.

The appellees introduced a deed from E. O. Le Grande to Mary E. Frazer, as the heir of David Brown, dated February 4, 1852, and recorded in Tyler county on the 11th day of March, 1852, as follows:

"State of Texas, San Augustine County.

"This indenture made this the seventh day of Feb. eighteen hundred and fifty-two, between Edwin O. Le Grande of the state and county aforesaid of the one part, and the heirs of David Brown late of said county dec'd of the other part, to wit: Mary E. Frazer formerly Mary E. Brown only heir of David Brown and her husband William Frazer in right of his said wife witnesseth that for and in consideration of the sum of five dollars to me in hand paid, the receipt whereof is hereby acknowledged, as well as in consideration of the trust reposed in me, by the said David Brown in his lifetime by which I hold in trust for the benefit of the said David Brown his heirs and assigns the lands granted to the following persons as their head which lands have been conveyed to me by the said David Brown, or procured by him to be conveyed to me though absolutely in the deeds but in fact in trust for the said David Brown, his heirs and assigns, to wit: The lands granted to Geo. W. Brooks as his headright, Geo. P. Lawson as his headright, Uriah Davidson as his headright, Samuel A. Fisher as his headright, James Rafferty as his headright, S. P. Bankston as his headright, William F. Slaughter as his headright, and T. J. Harrison as his headright, each supposed to be one league of land and supposed to be located on the west side of the Neches in said state. Now in consideration of the premises, I the said Edwin O. Le Grande have this day bargained, sold and conveyed released and forever quitclaimed the aforesaid lands or the lands granted to the aforesaid persons as their headrights so far as any title now is or ever has been vested in me unto the heirs of the said David Brown, to wit, the said Mary E. Brown, née Mary E. Frazer, and her said husband, William E. Frazer, so far as the title would vest in him by virtue of his intermarriage with the said Mary E. Brown, their heirs and assigns, and will forever warrant and defend from all persons claiming under him to the heirs of the said David Brown his heirs or assigns. To have and to hold the same forever.

"In testimony whereof, the said Edwin O. Le Grande hath hereunto set his hand and seal the day and year above written. Signed, sealed and delivered and acknowledged in the presence of

"Test: John Smith.
"Aceion Shoper.
"E. O. Le Grande.     [L. S.]"

Duly acknowledged by Le Grande. This deed was filed March 5th, 1852, and recorded in the records of Tyler county on the 11th day of March, 1862.

It is perhaps unnecessary to follow the chain of title under this claim, but sufficient to say that by mesne conveyances the land was transferred to the defendant Houston Oil Company of Texas and others. It was so agreed between counsel.

The appellees also offered in evidence an original deed which was sent up with the record, from George W. Brooks and Eliza Ann Brooks to Hugh B. Boston, conveying "all the right, title and interest and claim which we have in and to" the George W. Brooks league, the warranty clause being a warranty to the grantee in the deed of "all the right, title and claim that we have in and to the above-described league of land," same being dated the 5th day of May, A. D. 1856, and recorded in Tyler county, October 23, 1856.

Appellees also introduced in evidence a certified copy of the judgment in favor of Hugh B. Boston against W. B. Frazer and wife, in the district court of Tyler county, allowing recovery of this land, dated 8th day of November, 1858, but this judgment was set aside and new trial awarded in said court at said term, and on the 2d day of November, 1860, another judgment was rendered that the plaintiff take nothing by his action, and defendants go hence without day, and that defendants have and recover all costs by them expended. An order also appeared, overruling motion for new trial, dat-

ed the same term of court, and it appears an appeal was taken to the Supreme Court, and judgment affirmed on February 8, 1867.

A photographic copy of George W. Brooks' signature to his grant and his original deed was introduced by appellants for the purpose of showing that he was a different person from this one who made the deed to Boston, who failed to sustain that suit.

The depositions of John P. Irvin were also introduced, showing that he purchased, among other lands, the Brooks league, and paid the consideration mentioned in the deed, and that he knew nothing about any adverse claim thereto outside his chain of title, to wit: Brooks to Le Grande, Le Grande by mesne conveyances to Irvin.

There was also introduced evidence showing the payment of taxes at various times on portions of this league by the Texas Pine Land Association, and the Houston Oil Company of Texas, from 1894 to 1911. One witness was introduced, S. A. J. Hare, whose testimony was given in support of the plea for title by limitation set up by defendants below.

The appellants relied upon their paper title, which they claimed to be a perfect title to the land in controversy. The appellees relied on the certified copy of the junior deed from George W. Brooks to E. O. Le Grande, and the Le Grande deed to Mary E. Frazer, and, in addition thereto, on the failure of H. B. Boston, claiming also from George W. Brooks and Eliza Brooks, to recover the land from the Frazers. Appellees also relied upon the statute of limitation by virtue of the contract made with S. A. J. Hare, and possession held by the said Hare thereunder, and appellees also relied upon their claim that they were innocent purchasers for value, without notice of the title asserted by the intervening claimants.

We think the above is sufficient to give a concrete idea of the title claimed by each party to this controversy.

Appellants' first, second, and third assignments are as follows:

(a) The court committed error in directing a verdict for the defendants in this cause, because the undisputed evidence in the case establishes a good and perfect title in these appellants, and there is no evidence establishing any title as a defense thereto in the defendants.

(b) The court erred in admitting in evidence the certified copy of a pretended deed of conveyance from George W. Brooks to E. O. Le Grande, purporting to bear date February, 24, 1841, and in overruling the objections interposed thereto.

(c) The court erred in holding as a matter of law that the certified copy of the purported deed from George W. Brooks to E. O. Le Grande of purported date 24th of February, 1841, placed title in the appellees to the land in controversy, because the instrument was attacked by affidavit and pleading as a

forgery, and the original was not produced, or accounted for, and there was no proof of its execution as at common law, and because the alleged deed, if genuine, conveyed no title, because the undisputed proof shows that George W. Brooks had previously conveyed the land in controversy by his original deed to Arthur Henrie on the 3d day of February, 1836.

The first proposition is that it was error to admit in evidence a certified copy of the record of a deed purporting to have been executed by George W. Brooks to E. O. Le Grande in the absence of proper predicate accounting for the nonproduction of the original deed. There was no affidavit setting up the loss of the original deed, and there was no proof of search for the deed. A certified copy of the record of the original deed was tendered in evidence. A photographic copy of the signature of George W. Brooks to his application for this land was introduced in evidence, among other things, and it was contended that appellants showed by an unquestioned deed that George W. Brooks had conveyed this land to Arthur Henrie on the 3d day of February, 1836, and it is urged by appellants that, while the admissibility of the purported deed was for the court to decide, the validity of this deed as a conveyance was, under any circumstances, a question for the jury to decide.

[1] This court, in the recent case of Village Mills Company v. Houston Oil Company of Texas, 186 S. W. 785, used the following language:

"The filing of the affidavit of forgery puts the burden of proving the execution of this deed upon appellees, and it becomes necessary to inquire whether a sufficient predicate was made, authorizing the introduction of such a conveyance, and especially a certified copy thereof."

[2] No predicate was laid in the instant case for the introduction of this certified copy, and, without citing numerous authorities on the proposition, we are of opinion that the issue was raised as to the genuineness of the original, and we believe that the failure to account for the nonproduction of the original instrument, taken in connection with the prior conveyance by Brooks, the signature to which was not called in question, and, in fact, that there was no corroborative circumstance or circumstances shown tending to show the proper custody of the said original instrument, or its authenticity, that the same should have been excluded, or, at least, we believe that it was an issue that should have been submitted to the jury for determination. Therefore the action of the court was error, and these assignments are sustained.

Appellants' fourth, fifth, sixth, seventh, and eighth assignments are as follows:

(a) The court erred in holding as a matter of law that the defendants established title to the land in controversy as innocent purchasers for value under the purported conveyance from Brooks to Le Grande of date

December 24, 1841, and under the quitclaim deed from E. O. Le Grande to Mary E. Frazer, dated February 1, 1852, under which alone the defendants claim to deraign title to the land in controversy, for that there was no evidence establishing as a matter of law such claim of innocent purchaser for value of the land in controversy under said conveyances.

(b) The court erred in holding as a matter of law that John P. Irvin was an innocent purchaser for value of the land in controversy in this suit.

(c) The court erred in holding as a matter of law that Mary E. Frazer was an innocent purchaser for value of the land in controversy.

(d) The court erred as a matter of law in holding that E. O. Le Grande was an innocent purchaser for value of the land in controversy.

(e) The court erred in holding as a matter of law that David Brown was an innocent purchaser for value of the land in controversy.

The first proposition strenuously urged is that John P. Irvin was not an innocent purchaser of the land in controversy because he is shown to have derived his title through a quitclaim deed from E. O. Le Grande to Mary E. Frazer. These deeds have already been set out in full. The warranty clause, as above set out, is "and will forever warrant and defend from all persons claiming under him to the heirs of said David Brown, his heirs or assigns, to have and to hold the same forever." As said heretofore, the title is shown to be conveyed by regular successive chain of transfers from William B. Frazer and wife to John P. Irvin. We have already stated that John P. Irvin testified, in effect, that at the time of the purchase of the land by him there was nothing of record in Hardin county denoting any outstanding title to the land in controversy, and that on November 23, 1890, said instruments were recorded denoting an outstanding title; that he paid the fair market value for the land in controversy, and at the time of such payment had no notice of any outstanding title. This is all the testimony upon the question of innocent purchaser.

[3-5] We hold that under the authorities the deed from Le Grande to Frazer was a quitclaim deed. Then the question arises as to whether one who derives his title and holds through a quitclaim deed can be an innocent purchaser, and we may say in this connection that there is no evidence in this record that we have been able to discover that establishes the fact that Mary E. Frazer, E. O. Le Grande, or David Brown paid a valuable consideration for the land in controversy, and the only evidence as to innocent purchaser is as to the purchase of John P. Irvin. We are of opinion that it is incumbent upon a person who is seeking to set aside a prior conveyance upon the ground that he is an innocent purchaser without notice to establish the fact that would constitute him such bona fide purchaser, and from this record we do not understand it to be contended that any one else in appellees' chain of title took the league in controversy as innocent purchasers for value. It is contended, nevertheless, that because the immediate deed to Irvin was not a quitclaim, he was not bound by the decisions of this state on that subject, however the decisions of the United States Supreme Court might be. In the case of Cook v. Smith (Sup.) 174 S. W. 1095, the present Chief Justice of this state used the following language:

"If the deed from Potts to Neff was only a quitclaim deed, Cook's title, deraigned through that deed, and resting upon it, was not such, under the rule of decision in this state, as would sustain the defense of an innocent purchase of the property, though the deed from Neff to him was a general warranty; for in such case the record, or apparent title to the property was clearly only such as Potts [himself] possessed, and which, because of a previous conveyance to Smith, was no title at all."

In our opinion, this effectually disposes, so far as this court is concerned, of the proposition, and in this connection we will say that the latest expression of the Supreme Court only follows numerous decisions heretofore, holding practically the same view.

[6] There is no testimony on the question of innocent purchase for value, of any valuable consideration for the land in controversy having been paid outside, in so far as Mary E. Frazer, E. O. Le Grande, or David Brown are concerned. Therefore we are persuaded to believe that the lower court was in error in overruling said assignments, and the same should have been, in our judgment, and are now sustained.

Appellants' ninth to thirteenth assignments of error, respectively, are as follows:

(a) The court erred in holding that the defendants, as a matter of law, had established title to the land in controversy under the 10 year statute of limitation, based upon the evidence and occupancy of S. A. J. Hare.

(b) The court erred in holding as a matter of law that the contract of tenancy by S. A. J. Hare, in 1883, to the place he was then living on, on the east end of the Brooks league, and which he abandoned in the year 1888, was a contract of tenancy embracing the entire Brooks league of land, contrary to the express limitations contained in said league.

(c) The court erred in holding as a matter of law that S. A. J. Hare, when he abandoned said leased premises on the east end of the Brooks league and purchased the 50-acre tract for his wife, Missouri Hare, from Gibson on the west end of the Brooks league, continued as the tenant of Irvin and Texas Pine Land Association, succeeding Irvin's claim of the whole league until his final abandonment of said last-named place about April 1, 1896.

(d) The court erred in holding as a matter of law that S. A. J. Hare continued in the uninterrupted possession, use, and cultivation of the entire league in controversy so as to perfect 10 years limitation in Irvin and the Pine Land Association, notwithstanding the abandonment of the leased premises on the east end of the league in 1888, and the open and hostile claim of Missouri Hare and S. A. J. Hare to the Gibson 50-acre tract on the west end of the league, and notwithstanding during the fall year of 1889 and 1890 said S. A. J. Hare and wife abandoned said last-named premises and lived at Franklin Lake, on the O. C. Nelson league.

(e) The court erred in refusing to submit to the jury, upon request seasonably made, special issue No. 1 requested by the intervening plaintiffs, which is as follows:

"The intervening plaintiffs, Edith L. Niles et al., request the court in the event the court refuses their request for a directed verdict, and in that event only, to submit to the jury the following:

"Special Issue No. 1. Did or did not the defendants, Houston Oil Company of Texas, Kirby Lumber Company, Maryland Trust Company, or either of them, have a tenant upon said land for a full period of 10 years using, cultivating or enjoying said land without a break for a consecutive period of 10 years before the filing of this suit? Let your answer be Yes or No as you may find the facts to be.
"[Signed] W. D. Gordon & Thos. J. Baten,
"Attorneys for Intervening Plff.

"The foregoing request was duly submitted to the court at the conclusion of the evidence and before the jury was charged, and was likewise submitted to opposing counsel and the court refused the same.
"[Signed] J. Llewellyn, Judge."

The proposition submitted by appellant under these assignments is that the possession of S. A. J. Hare, as tenant of appellees, is insufficient as adverse possession to support appellees' pleas of limitation to the land in controversy, because it is shown to have been under lease contracts restricting the use, occupation, or enjoyment of the said S. A. J. Hare to a limited part of the land in controversy.

We have examined the entire record, and we find no plea addressing itself to any restricted portion of the land in controversy.

Appellee introduced in evidence the following lease contract between H. W. Bush and E. A. Irvin:

"For and in consideration of the use, occupancy and enjoyment rent free of the houses, field and improvements, now occupied by me and situated on the league of land in said county granted to G. W. Brooks on the 22d day of August, A. D. 1835, by the government of Coahuila and Texas, and in further consideration of the right granted to me to make use of any timber necessary for firewood and to keep in repair the fences and houses, part of said improvements, I acknowledge myself the tenant of and to be in possession for E. A. Irvin, the owner of said league of land and agree as such tenant to occupy and hold possession of said league of land.
"Given under my hand this the 24th day of October, A. D. 1883. [Signed] H. W. Bush."

Appellees also introduced the following instrument:

"For and in consideration of the use, occupancy and enjoyment, rent free, of the house, field and improvements, now occupied by me and situated on the league of land in said county, granted to G. R. Brooks on the 22d day of August, A. D. 1835, by the government of Coahuila and Texas, and in further consideration of the right granted me to make use of any timber necessary for firewood and to keep in repair the fence and houses, part of said improvements, I acknowledge myself the tenant of and to be in possession for E. H. Irvin, the owner of said league of land and agree as such tenant to occupy and hold possession of said league of land.
"Given under my hand on the 23d day of October, A. D. 1883.
                                    his
"[Signed]  S. A. J.  X  Hare.
                                  mark
"Attest: J. P. Copley,
         "John P. Irvin."

Appellees also introduced the following lease contract:

"The State of Texas, County of Hardin.
"For and in consideration of the use, occupancy and enjoyment during the pleasure of John P. Irvin, rent free, of the house, fields and improvements now occupied by me, and situated on the league of land in said state and county granted to G. W. Brooks on the 22d day of August, 1835, by the government of Coahuila and Texas, and in further consideration of the rights granted me to make use of any timber necessary for firewood and to keep in repair fields and houses part of said improvements and also the option of purchasing said improvements at their value any time within the next five years from this date, I acknowledge myself to be tenant of and to be in possession for John P. Irvin, the owner of said league of land, and agree as such tenant to occupy and hold possession of said league of land, it being understood this lease is not transferable.
"Witness my hand on this the 7th day of July, A. D. 1890.
                                    his
"S. A. J.  X  Hare.
                  mark
"Witness: A. H. Irvin."

The acknowledgment of tenancy from Ike Gore and wife to Houston Oil Company of Texas, dated June 21, 1907, covering the entire league of land, was introduced by appellees, said lease to run until January 1, 1911, acknowledged before W. A. McClelland, notary public Hardin county, Tex., on June 21, 1907, and recorded July 2, 1907, in Book 46, page 598, Deed Records of Hardin county.

Appellees also introduced in evidence acknowledgment of tenancy of W. H. Wall and wife to Houston Oil Company of Texas, dated June 6, 1906, covering 4,255 acres of the G. W. Brooks league of land in Hardin county, said lease to run until January 1, 1912. This instrument was duly acknowledged and recorded July 3, 1906.

Appellees also introduced acknowledgment of tenancy of Geo. Kirkpatrick to Houston Oil Company, dated March 9, 1907, covering Geo. W. Brooks league, said lease to run to January 1, 1913. This instrument was duly acknowledged, and recorded on March 9, 1907.

Appellees offered in evidence the following lease:

"The State of Texas, County of Hardin.
"For and in consideration of the use, occupancy and enjoyment, rent free, of the houses fields and improvements now occupied by me

and situated on the league of land in said county granted to G. W. Brooks on the 22d day of August, A. D. 1835, by the government of Coahuila and Texas, and in further consideration of the right granted me to make use of any timber necessary for firewood and to keep in repair the fences and houses a part of said improvements, I acknowledge myself the tenants of and to be in possession for E. A. Irvin the owner of said league of land, and agree as such tenant to occupy and hold possession of said league of land. It is also understood and agreed that at any time within five years from this date, the said Irvin will make me a deed for fifty acres of land including the above mentioned improvements at the price of one dollar per acre.

"Given under my hand on the 23d day of October, A. D. 1883.          Calven Gore.
"Witness:  John P. Irvin,
          "J. J. Copley."

The testimony of S. A. J. Hare is herewith set out in full, as follows:

"My name is S. A. J. Hare—that is the way I sign my name—and at one time I lived on the George W. Brooks league of land in this county, but on the 23d day of October, 1883, I signed a lease to Mr. Irvin. I was living on the land at that time. The land I was living on was said to be the Brooks league, and known as the Brooks league. I signed that lease in 1883 as well as I remember, and I continued to live on that land on up until in August, 1888, and then I bought out a place where Calvin Gore lived out on the west end and moved out there. Where I lived first was out on the east end towards the river, right on the river. As I stated, I moved out on the west end to that Calvin Gore place in 1888, and I lived there until 1897 —the 1st day of April, 1897, I left there. I was making my home on that league at that time, and raised a crop every year. I had my family there, and we all lived there together. There was one year that I had it rented out. I moved off that place in April, 1897, but my sons stayed there and gathered the crop that year; we had a crop planted when I left there, and they stayed and gathered the crop, and after they moved off, my son-in-law, Bill Goins, took possession, but I don't remember exactly how long he stayed there, whether one year or two years. He took the place under arrangement with me, under my say-so. He was staying on there on my say-so. He stayed on that place until Ike Gore took possession, but I can't tell you how long Gore stayed there; he has never moved off that I know of. He has been right there ever since he moved there, and he has cultivated some of the land every year. I don't know whether Ike Gore is sick now or not, but that is what I heard, that he is sick in bed, and he is not here to court. If he is, I haven't seen him; it is my understanding that he is sick. During the time I was living over on the east end of the league from 1883 to 1888, Calvin Gore was living on the west end of the league; he was living there about the time we signed these leases, but he sold out there some time afterwards and left there, but I don't know how long he stayed there after he signed the lease. When I moved from the east end to the west end, I moved to the place where Calvin Gore had been living before. I bought it from Bud Gibson. In 1890, I executed another lease to J. P. Irvin. During the time I was on that league and had my sons and son-in-law on the land, I was holding it under the leases I had signed; as a matter of course, if I had not been holding under those leases, I would not have signed them. When I left that Calvin Gore place in 1897, the Texas Pine Land Association were building a tramroad. They were at work on the tramroad somewhere about the Brooks league; don't know exactly right where. That was in 1897. That tram has been in operation across the Brooks league of land since

that time, and up to the time they quit operations in there. I think it has been operated recently in the name of the Kirby Lumber Company. That road has been operating all the time up to right recently. They have tore up a part of the tram, and I don't think they run any logs on it now, nor haven't in some time; don't know as I can tell you how long, suppose a couple of years since they run any logs on it. They have been running trains carying men to what they call the upper camp until here right lately."

On cross-examination:

"I went on the George W. Brooks league of land in 1876 I believe, and they came to me to get me to sign the lease in 1883. The place I lived on was an old settled place when I went there in 1876, but I bought out a fellow named Tanton; he was a squatter in there, and I bought out his claim. You can call him a squatter or whatever you please, but I bought his claim in 1876, as well as I remember. I cleared up the land and put in cultivation, and he had a little house there, but I didn't live in that house long until I built me another one, a log house, with one room, about 18x20 and a gallery on each side. I had a well of water there and built me a good crib. I was covering on it when they come to me to sign the lease. I had a little field there of about 10 acres, I suppose, with a rail fence around, and was cultivating it, and did cultivate it from the time I went there until I left. I had my hogs and chickens there, and lived there just like fellows do that is at home now trying to make a living. I bought that claim from a fellow named Tanton, who originally went in there and cleared it up; he hadn't cleared much up. It was a place that was cleared up before the war. A fellow cleared it up before the war—it wasn't a big field—and then he sold it out, and first one and then another sold it, and it would go down, and another fellow would get hold of it and built it up again. When I went there to live on the place I never asked Irvin anything about it. There was nothing said them days about any one claiming the land. I didn't ask any landowner's permission to build a house on it. Mr. Doucetts is not the man that brought the lease there for me to sign in 1883; old man Copley is the one that brought it. He is the man that stirred up this muss. He threatened to put us off if we didn't sign the lease, and I did sign it. I lived there after I signed the lease, but, having signed it, I had to acknowledge that I was living there as a tenant, but in all other respects I lived there just the same as I had before I signed the lease; I used timber and done as I pleased with anything that was there, just like I had before I signed it. I didn't spread out over the league. This lease says 'in consideration of the use, occupancy and enjoyment, rent free, of the house'; that is, the house I built there. Also 'the field,' which is the field I cleared, 'and improvements thereon,' they are the improvements I put there—'now occupied by me and situated on the league of land in said county granted to Geo. R. Brooks on the 22d day of August, 1835, by the government of Coahuila and Texas, and in further consideration,' etc., 'I acknowledge myself the tenant of and to be in possession for E. A. Irvin, the owner of said league of land.' I supposed he was the owner; I didn't have any right to dispute it. I didn't know who was the owner. This man Copley came there and said Irvin was the owner, and if I didn't sign the lease I had to get off. I did sign it, and that was the portion of the league that I claimed to exercise right over, didn't claim to exercise dominion over the balance of the league. I had nothing to do with any part of it outside of my particular place, and what was around my place. I was a widower just before I left that place in August, 1888. I married Missouri Whittaker in August, 1888, and, of course, then I left there. She re-

quired that I make a trade for some land on my own account before she would marry me. She didn't want to live in the swamp; didn't want to live in the bottom. In those days it was considered that the swamp was a graveyard, and she would not marry me until I got out of there. She didn't say she wouldn't marry me unless I got out, but I told her I wouldn't force her to go in there if I could buy a place outside, and I saddled old Blue and rode out to that place and saw Bud Gibson. · He was the man that owned that place them days. He was living on the west end of the Brooks, but I couldn't tell you how long he had been living there. He was claiming 50 acres there on the west end where Calvin Gore signed that lease; they was to give him 50 acres at the end of 5 years for one dollar an acre. That 50 acres was to include the house and improvements ·he had. The 50 acres Gore was to get at the end of 5 years he sold to Bud Gibson—no, Calvin sold it to a fellow by the name of Page, and Page sold it to Bush, and Bush sold it to an old man, McInnis, and he let Bud Gibson have it, and I bought it from Bud Gibson. I went out there and made the trade with Gibson, and then went back and told Missouri, 'Well, now, Missouri, I have got you fixed up;' don't know whether I used them exact words or not, but that is about it. I am not going to tell you folks all that I told her then. She said all right, 'We will see the preacher' and I got old man Caraway, and we then moved on this 50 acres of land. I don't remember exactly what time in August we went on that land, but it was in August that we moved out there. The improvements there consisted of a hewn log house; it was a tolerable old house; was put up in 1870. I dug the well there for old man Berry in July, 1870, and he had the house up then. Also, somebody put up a log crib, a corn crib and stable, and I suppose some 12 acres of cleared land, and had a fence around it. In 1889 I put in a crop there on that place, and I continued to live on and cultivate that place until April 1, 1897. I moved off the 1st day of April, and went about 2½ or 3 miles above there on the James Rafferty tract of land. During the time we lived on that place we got from Gibson we claimed that as our own—to tell you the truth about it, I give that place to my wife when I bought it, when we were married—and told her it was her place. We claimed that place as ours, and no one else's. That was the understanding; that that 50 acres was ours. In 1896, or about that time, the Texas Pine Land Association set up a claim to that land, and my wife went to Beaumont and got Votaw & Chester and engaged them as attorneys to represent us. Of course, I joined her in the matter. I had no objection to it, and they brought suit here in this court. That suit is No. 552, filed June 8, 1896, in the district court of Hardin county, Texas. I did not claim that I was occupying that 50 acres of land for Irvin or anybody else; that was my land; I bought it; I paid $125 for it. I don't know what Mr. Gibson paid for that land, nor do I know whether Mr. Gore paid more than the $1 an acre for it or not—all that I know about that is he sold it to Mr. Page. I moved off that 50 acres of land in 1897, the 1st day of April, 1897, and moved over to the Rafferty, or Nelson, but I never did sign a lease to the Texas Pine Land Association to any part of the Nelson, except in the swap, which was like this: They called the place I bought there (which is the same place I live on now) the O. C. Nelson, the deed showed it was on the Nelson, and some time after I bought it they begin to find out there was a mistake, and that the Nelson was back down this way, and that was the Rafferty, and we made a trade, and I give them a deed and they gave me a deed; that is the way me and the Texas Pine Land Association swapped. I don't remember exactly when that was, but it was 4 or 5 years ago.

I never did give them a lease for that place; don't remember of signing any lease on the Nelson. I see this paper you hand me, but I can't read a thing in the world. (Appellants here offered in evidence the lease of Texas Pine Land Association to S. A. J. Hare, dated March 23, 1896, covering portion of O. C. Nelson league.) "I did not live on that place at the time I signed that lease, couldn't tell you exactly how long it was before I signed the lease that I lived on that place, but it was a couple of years probably. I just went in there and lived there one year; I bought a claim there is how come me to do it. I bought a claim from Bush, and me and this woman was married and went in there and lived there one year. I was married in 1888, and that was one year before I signed the lease. I then left there and came on down and lived on the Gore place, and I was living on the Gore place when I signed it. I couldn't tell you how long it was after I signed it before I went on back up to the Rafferty, but I went up there on the 1st day of April, 1897. I don't think I made a crop on the Rafferty the same year I signed the lease. I have sorter got this thing mixed up. I know that I moved up to the place I am living on in 1897, and I never made no crop on the Nelson after I signed the lease. If I signed the lease in 1896 it was about a year after that that I moved. Therefore it was a year after I signed it before I occupied it. I was brought here as a witness in the Kimble case to testify as to my occupancy of the Nelson, but if I swore in that case that as soon as I signed the lease that I moved upon the land, I didn't understand it. My recollection is very bad, and I can't remember anything unless it is something that I have to pay very strict attention to, and I didn't pay strict attention to how long it was after I signed that lease before I went on the Nelson, and I can't tell when I did go on the Nelson, but I am satisfied I never went on the Nelson before I signed the lease. I testified in the Kimble case that I occupied a part of the Nelson after I signed the lease. I can't tell you where I was living exactly in 1890; I moved about a good deal, but I must have been living on the Gore place in 1890; was bound to have been as well as I remember; that was the year my son signed the lease to the place on the Nelson, and I don't feel disposed to say exactly where I was living that year. In 1891 I was bound to have been living on the Gore place. I went on the Gore place, as I told you, in August, 1888, and made one crop there—that would have been 1889, and the next year was the year I lived on the Franklin Lake place, and I think that it was somewhere about March that I then moved back on the Gore place and stayed there until I left there. In 1892 I lived on that same place, and 1894 also, and that is the year that old Blue was a yearling. I have told you the truth about this, and have told you that I was not off that place but one year from the time I went there until I left it. I was there in 1895 and 1896. I remember signing that contract, but don't remember what year it was, but I know I never lived on the Nelson after I signed it. After I signed it I moved on the Rafferty, and when I found out I was on the Rafferty and not on the Nelson we exchanged deeds. They did not agree to give me 50 acres to go on the Nelson and hold it for them, and they didn't give me 50 acres; they never give me anything. I got 160 acres on the O. C. Nelson; that was what I was supposed to get, and the deed showed that way, in the southwest corner of the Nelson, but when they begin to straighten up everything they found it was on the wrong league. I don't know how long it was after I left the Gore place before we went to Beaumont and employed Votaw & Chester to represent—to bring suit for my wife. I never went to Beaumont to see them myself; Mr. Caraway went. He is the man that tied the knot for me and

Missouri. I was living on the Gore place when he did that, and after I got in the scrap with them in the lawsuit I moved off. My wife died in September, 1897, and they knocked me out and said I couldn't do nothing with it, and I just quit attending court; I paid out $10.15 first and last, and quit the case and left it to the lawyers. If the lawyers filed another suit after that first one, I didn't have anything to do with that."

On direct examination:

"From 1883 as long as I lived on the east end of the league I made a crop there every year. And from the time I went on the Gore place until I left there in April, 1897, I stayed there every year with the exception of one. Q. And did you make a crop every year on the Gore place during that time? A. Yes, sir. One year I was over on the Lake place; that was the second year after I went on the Gore place. The year I was away from the Gore place I had it rented out to Mr. Kurkendall's boy. After I moved off the place in April, 1897, my son lived there that year out. We had a crop planted there that year, and he stayed there that year. I had an interest in the crop. The year following that one of my sons-in-law lived on it; I told him to if he wanted to."

It will be seen that he testified that he went on the land in 1876, and that they came to him to sign the lease in 1883. That the place he lived on was an old settled place when he went there in 1876. It appears that after he signed the lease to E. A. Irvin, he continued to lived on the portion of land until 1888, and says:

"I signed that lease in 1883, as well as I remember. I continued to live on that land until August, 1888, and then I bought out a place where Calvin Gore lived out on the west end, and moved out there. Where I lived first was out on the east end by the river, right on the river."

After moving out on the west end to the place he testified he bought from Calvin Gore, he did not continue under contract of tenancy as tenant of appellees, and he says on this proposition:

"I was a widower just before I left that place in 1888. I married Missouri Whittaker in August, 1888, and of course then I left there. She required that I make a trade for some land before she would marry me. She didn't want to live in the swamp; didn't want to live in the bottom. In those days it was considered that the swamp was a graveyard, and she wouldn't marry me until I got out of there."

He says he saddled "old Blue" and rode out to that place and saw Bud Gibson; that he was the man that owned that place "them days." He was living on the west end of the Brooks, but that he could not tell how long he had been living there; that he was claiming 50 acres there on the west end where Calvin Gore signed that lease; they were to give him 50 acres at the end of 5 years for $1 per acre; that the 50 acres Gore was to get at the end of the five years he sold to Bud Gibson.

"No, Calvin (Gore) sold it to a fellow by the name of Page, and Page sold it to Bush, and Bush sold it to old man McInnis, and he let Bud Gibson have it, and I bought it from Bud Gibson." "I didn't claim that I was occupying that 50 acres of land for Irvin or anybody else; that was my land, I bought it; I paid $125 for it." "I moved off that 50 acres of land in 1897, and moved over on to the Rafferty or Nelson, but I never signed the lease of the Texas Pine Land Association to any part of the Nelson." "After I signed the lease in 1896, it was about a year after that I moved. Therefore it was a year after I signed it before I occupied it, and I can't tell you when I did go on the Nelson, but I am satisfied that I didn't go on the Nelson before I signed the lease."

As to the amount of land he occupied and exercised dominion over under his lease from E. A. Irvin, this witness said:

"This man Copley came there and said Irvin was the owner and if I didn't sign the lease I had to get off. I did sign it, *and that was the portion of the league I claimed to exercise right over. I didn't claim to exercise dominion on the balance of the league. I had nothing to do with any part of it outside of my particular place and what was around my place.*" (Italics ours.)

In the case of Houston Oil Company v. Kimball, 51 Tex. Civ. App. 65, 114 S. W. 667, the court used the following language:

"Under the thirteenth assignment, which relates to a refused charge, the proposition is that the evidence showed such possession by defendant, and those under whom it claims, as to establish title by the several periods of limitations. The proposition is equally applicable to the other assignments in referring to limitations. The court submitted the 3-year statute with special reference to the possession of the trustees of the Texas Pine Land Association, their agents or employés, for 3 years prior to the institution of the suit. The 3-year and all other statutes of limitation with reference to the possession of previous claimants in defendant's chain of title was not charged, and all charges asked on that subject were refused. From 1881 to 1891 the Irvins held this title. It appears that in 1883 John T. Lewis and R. R. Hester had squatted on small pieces of this league. In October, 1883, Lewis signed a lease in favor of E. A. Irvin, which read: For and in consideration, rent free, of the houses, field and improvements then occupied by him and in consideration of the right to use timber for firewood and to make repairs, he acknowledged himself the tenant of Irvin and agreed 'as such tenant to occupy and hold possession of said league of land.' A similar lease of another parcel was given by Hester at the same time. Both leases referred to 'the use, occupancy and enjoyment, rent free, of the houses, field and improvements now occupied by me and situated on the league of land,' etc., but not describing any part. Another part of the league appears to have been used by a man named S. A. J. Hare and his son for about 13 years in 1896. They were holding for nobody during that time, and on March 23, 1896, he signed a tenancy in favor of the Texas Pine Land Association, acknowledging himself a tenant at will of 'about 100 acres of the tract,' which he agreed to occupy, etc. C. T. Hare, son of the above, in 1890 signed a lease to Irvin 'of the houses, field and improvements now occupied by me' on said league, with right to firewood, etc., and agreeing, as such tenant, to occupy and hold possession of said league of land. In February, 1896, a lease was signed by N. R. Gray in favor of the Texas Pine Land Association, for about 10 acres undescribed of the Nelson league. This man also appears to have been a squatter. And on March 10, 1896, N. H. Gray and D. A. Gray entered into a similar lease with reference to about 50 acres of the league. It appears to us that it would be useless to try to trace the continuity and duration of possession under said attornments, in view of the fact that there was no plea of limitations having reference to the parcels so held or leased, the plea addressing itself to the whole league. There was no pos-

sibility of ascertaining from the pleadings or evidence a description of any of said parcels; hence there could be no recovery of anything by limitations but the entire league, and to accomplish this it would have to be held that the possession involved in the leases was sufficient to constitute a possession of the entire league. The decisions are againt this view. *The leases were of restricted parcels. The use essential to title under the statute was restricted to these parcels.* (Italics ours.) By the provision in some of the instruments, to the effect that the tenant agreed to occupy and hold possession of the league, it was manifestly not intended to lease the whole. Besides, in no instance was there any evidence that any of these tenants ever extended his possession beyond the parcel he was occupying with his houses, field, and improvements. Land Co. v. Williams, 51 Tex. 52; Read v. Allen, 63 Tex. 155; Desmuke v. Houston, 31 S. W. 198."

The Supreme Court of our state, in passing on the same case (103 Tex. 105, 122 S. W. 538), Judge Brown delivering the opinion, used the following language:

"It is contended that the court erred in restricting the possession of the Pine Land Association to its agents or employés, which excluded the possession of tenants who might have held under it. We find no evidence that any tenant who held directly under the Pine Land Association, and who claimed to have possession of the entire league, was in possession for three years before the institution of this suit. There was neither pleading nor evidence upon which a finding for the particular tracts occupied by the tenants could have been sustained; therefore, there was no error in that respect as to the tenants holding directly under the Pine Land Association. If there was evidence before the jury upon which they would have found that any one or more of the vendors, immediate or remote, of the land association had held possession by one or more tenants of the league of land in such manner as to comply with the statutes of limitation, then the charge would be erroneous, and would require a reversal of this judgment. The evidence shows that Copley, who represented J. P. and E. A. Irvin, who severally and at different times owned the title to the league under which the defendants claim, went upon the land in about 1883 and found on the league three squatters, each of whom had a portion of the land in cultivation with improvements thereon. Two of them, Lewis and Hester, each entered into a written contract of lease, whereby each agreed to hold possession of the entire league of land for one of the Irvins, who was then claiming title, in consideration of the use of the land that each had under cultivation, the houses, etc. It appears from the evidence that Lewis had acquired possession of the portion that he was on from a man named Bush, and that afterwards, by some arrangements, the premises were restored to Bush. This is not explained by the evidence, but the proof does not establish that Bush undertook to take the place of Lewis as the tenant of the Irvins. But if we grant that such was the fact, the evidence fails to show the continued possession of persons claiming under the said Lewis and Bush, acknowledging the title of the Irvins and claiming and exercising the right of possession of the entire league in the name of the owner of the Brown title. Failing in this particular, the evidence was not sufficient to sustain limitation by the possession and tenancy of Lewis. Hester was occupying a small portion of the land and the improvements thereon when the lease was executed, and continued to do so up to his death, which was within a year from the date of the lease. A short time after his death his wife and son sold the improvements to S. A. J. Hare, who did not in any way assume the tenancy contract of Hester. The proof shows that Hare and his son together did occupy the part of the land and improvements which had been in cultivation and which had been occupied by Hester, but there was no evidence that they asserted any right of possession, either for themselves or for the owner of the land, to any other portion of the league. No doubt it is true that Hare could not have disputed the title in the Irvins to the portion of the land which he received possession of from Hester, but this does not establish the possession by Hare, nor by his son, or those who were claiming under them, of the entire league of land in the name of the owners thereof, which is a necessary element in order to sustain the plea of limitation to the whole league. The court did not err in the charge complained of."

[7] The lease in controversy, and under and by virtue of which it is claimed that the land was held for appellees under their pleas of limitation, was in all material matters similar to the one under discussion in the above case. As said by Chief Justice James, we believe that the lease was of restricted parcels, and that the use essential to title under the statute was restricted to these parcels, and that it was manifestly not intended to lease the whole; that there was no evidence that the tenant ever extended his possession beyond the parcel he was occupying with his house, field, and improvements.

[8] We have carefully gone over the record, and have closely scrutinized and weighed the contentions of both the appellees and appellants. We have read the decisions, not only cited by both parties, but many other decisions bearing upon the questions involved in this appeal. We believe, after a careful examination, that neither under their plea of limitation, nor under their pleadings setting up that they are innocent purchasers, nor under the proof are the appellees entitled to recover this land. On the contrary, we believe that the land in controversy has been shown to be owned by the appellants, and that they have a good and perfect title thereto. *We do not believe* "that a man can enter upon the premises of another, restricting his claim to a small portion of such land of another, and when the time of limitation has arrived, claim the entire tract of land by limitation. *Nor do we believe* that he can enter through a tenant, restricting the claim of right through the tenant to a certain restricted portion of the land, and then after limitation has arrived claim the entire tract."

[9] We find several cross-assignments in the brief of appellees, but we have searched the record in vain to find where a seasonable objection was made to the admission of the testimony complained of; therefore they will not be considered.

The case has been fully developed, it does not appear that any new issue could be developed, and the testimony apparently cannot be amplified. So believing, and being of the opinion that the judgment of the lower court was error, the judgment of the court below is reversed, and judgment is here rendered for appellants. It is so ordered.

CONLEY, C. J., recused, and not sitting.